P-SEND



FILED
CLERK, U S DISTRICT COURT
APR - 9 2001
CENTRAL DISTRICT OF CALIFORNIA
BY _____ DEPUTY

# UNITED STATES DISTRICT COURT

## FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| Securities and Exchange Commission, )<br>)<br>Plaintiff, )<br>)<br>v. )<br>)<br>TLC Investments and Trade Co.; TLC )<br>America, Inc. d.b.a. Brea Development )<br>Company; TLC Brokerage, Inc., d.b.a. )<br>TLC Marketing; TLC Development, Inc.; )<br>TLC Real Properties, RLLP-1; Ernest F. )<br>Cossey a.k.a. Frank Cossey; Gary W. )<br>Williams; Cloud & Associates Consulting, )<br>Inc.; and Thomas G. Cloud, )<br>)<br>Defendants. )<br>_____ ) | CASE NO. SA CV 00-960 DOC (EEx)<br><br>**O R D E R** DENYING APPLICANTS' MOTION FOR AN ORDER LIFTING THE STAY OR, ALTERNATIVELY, FOR LEAVE TO INTERVENE |

A group of investors ("Applicants") request that the Court order the Receiver in this action to administer the Receivership as a trustee would administer a bankruptcy estate under the bankruptcy code In the alternative, the Applicants seek leave to intervene as parties in this action After consideration of the papers filed regarding this motion, oral argument on April 2, 2001, and other materials on file this matter, the Court DENIES the motion.

// ✓ Docketed
   ___ Copies / NTC Sent
// ___ JS - 5 / JS - 6
// ___ JS - 2 / JS - 3
   ___ CLSD



ENTER ON ICMS
APR 1 0 2001

# I.
# BACKGROUND

In this case, the Securities and Exchange Commission ("SEC") brings suit against several affiliated companies (collectively, "TLC entities") and three individuals. The SEC alleges that Defendants have engaged in a Ponzi-type scheme and have thereby defrauded the approximately 2,000 individuals who had invested in the TLC entities via promissory notes. After entering a temporary restraining order and then a preliminary injunction, the Court appointed a Receiver to manage the companies. The Court also approved a plan of liquidation. A group of approximately 700 of the investors in the companies, referred to here as "Applicants," now seek more participation in the Receivership and the liquidation plan.

# II.
# DISCUSSION

The Applicants make two alternative requests. First, they request that the Court order the Receiver to administer the Receivership estate as a trustee would administer a bankruptcy estate, following all the procedures of the bankruptcy code, including notice to all interested parties before a Receivership asset is sold and the appointment of a creditors' committee. Second, and in the alternative, they request that they be allowed leave to intervene as plaintiffs in this action.

As all of the parties agree, the Applicants and all the other investors have some due process rights in this proceeding. It is their investments and expectations that were harmed by Defendants' conduct and the focus of the Receivership is on returning as much of their money to them as possible. However, in keeping with the general rule that the process due varies according to the nature of the right and the type of proceedings, *Mathews v. Eldridge*, 424 U.S. 319, 334, 96 S. Ct. 893, 902, 47 L. Ed 2d 18 (1976), there are no specific standards or rules setting forth what rights investors in such proceedings have to participate. Instead, "summary proceedings satisfy due process so long as there is adequate notice and opportunity to be heard." *SEC v. American Capital Invs., Inc.*, 98 F.3d 1133, 1146 (9th Cir 1996), *abrogated on other grounds by Steel Co v Citizens for a Better Env't*, 523 U.S. 83, 93-94, 118 S Ct. 1003, 1012, 140 L. Ed 2d 210 (1998); *see also SEC v. Elliot*, 953 F 2d 1560, 1566-67 (11th Cir 1992); *SEC v. Hardy*, 803 F.2d 1034, 1036, 1039-40 (9th Cir. 1986) (approving of the claims procedures

used by a district court in a receivership case when all claimants were given reasonable notice and opportunities to be heard at hearings).

The Ninth Circuit has considered equity receiverships in SEC cases on several occasions. It has summarized the guiding principles as follows:

> As we have recognized, case law involving district court administration of an equity receivership is sparse and is usually limited to the facts of the particular case. Two basic principles emerge, however, from cases involving equitable receiverships, many of which involve SEC-initiated receiverships
>
> First, a district court's power to supervise an equity receivership and to determine the appropriate action to be taken in the administration of the receivership is extremely broad. . .
>
> Secondly, we have acknowledged that a primary purpose of equity receiverships is to promote orderly and efficient administration of the estate by the district court for the benefit of creditors. . . Accordingly, . . reasonable procedures instituted by the district court that serve this purpose [will be upheld].

*Hardy*, 803 F.2d at 1037-38 (citations omitted).

Of course, broad discretion is not limitless discretion The Ninth Circuit has indicated that district courts must balance the competing concerns quite carefully particularly when considering investors' ability to participate in the proceedings and when authorizing receivers to liquidate, rather than just manage, estates' assets. *SEC v Lincoln Thrift Ass'n*, 577 F 2d 600, 606, 609 (9th Cir. 1978) (stating that "liquidation of a corporation under a securities receivership may more properly be the subject of a bankruptcy proceeding," that "the district court should, at an early stage in the litigation, set forth in express terms the justification for retaining its equity jurisdiction, indicating why the exercise of its jurisdiction is preferable to a liquidation in bankruptcy court," and that the district court "perhaps should have" allowed intervention by creditors).

Thus, in considering the Applicants' requests, the Court must balance the Applicants' needs, the

needs of the other investors, efficiency, and judicial economy.

A. **Motion to Lift the Stay**[1]

On this motion, the Applicants request that the Court order the Receiver to administer the Receivership as a trustee would administer a bankruptcy estate. Specifically, they seek to have advance notice and an opportunity to be heard prior to any sale of a Receivership asset. They also desire that a creditors' committee be appointed to represent the interests of the investors.

It is only in rare cases that it is appropriate for a receiver, rather than the bankruptcy court and particularly before judgment has been entered, to liquidate, rather than manage, the assets of a receivership. With this principle in mind, the theory of the Applicants' request is in part that although they have withdrawn their initial request to place the TLC entities in bankruptcy, the policy behind the fact that liquidation normally occurs in bankruptcy court suggests that it is preferable for bankruptcy procedures to be followed. The Applicants draw further support from Local Rule 25.8, which provides that "[e]xcept as otherwise ordered by the Court, a receiver shall administer the estate as nearly as possible in accordance with the practice in the administration of estates in bankruptcy."

The Court has determined that this case is one of the rare cases in which liquidation by the Receiver, rather than in the bankruptcy court, is appropriate. First, liquidation at this time, prior to entry of judgment, is appropriate because the evidence presented to the Court demonstrated that the TLC entities' liabilities were greater than their assets and because ongoing management alone will drain

---

[1] The Applicants term this request a motion to lift the stay, but they explicitly state that they do not intend to initiate separate court actions. Mot. at 7 ("Applicants are not seeking to lift the Stay Order to enforce their claims against TLC in individual court proceedings. Instead, Applicants seek relief from the Stay Order to participate in these proceedings against TLC.") When the Court appointed the Receiver, it also stayed any other litigation against the Receivership and barred anyone from taking any actions that might interfere with the Receiver's actions relating to the Receivership's assets. Thus, the theory of the Applicants' motion is that to be more involved in the administration of the Receivership, as would occur if the Court ordered the Receiver to follow all the procedures of the bankruptcy code, they need "relief" from the stay. Although not explicitly stated, it seems that the Applicants do not desire for the Court to lift the stay to the extent of allowing anyone to bring a claim against the Receivership in any forum.

money out of the estate, money that otherwise could be returned to investors.[2]

Second, liquidation by the Receiver is appropriate because of the close connection between the actions necessary for liquidation—selling off the assets—and the actions necessary to the Receiver's ongoing administration of the Receivership. The showing made by the SEC on its motions for a temporary restraining order and a preliminary injunction and the Receiver's initial reports demonstrated a strong likelihood that Defendants have violated the securities laws. Further, the evidence submitted demonstrated that significant work needed to be done to determine what the assets were, who the investors were, and, on an ongoing basis, to manage the assets, which included distressed real estate throughout the country, racehorses, and racing dogs both in this country and Mexico. Liquidation consists of selling off assets that need constant oversight and management by the Receiver, including the racehorses. In the course of his initial investigatory work to take control over and possession of the TLC entities' real estate holdings, the Receiver found out about some sale possibilities that were already in the planning stages. Also, the Receiver was able to purchase additional land that will make it possible to at least break even when he goes to sell the Marina Coves holdings. The Receiver traded one set of properties for another set that was more easily sellable. Thus, in the unique circumstances of this case, there is such a close connection between the actions necessary for ongoing oversight of the Receivership's assets and for liquidation of those assets that it is appropriate for the Receiver, rather than a bankruptcy court, to carry out the liquidation. *See generally Universal Fin.*, 760 F.2d at 1039 (noting that the district court below authorized a receiver to liquidate the receivership).

For similar reasons, the Court concludes that it would be unwise to require the Receiver to follow bankruptcy procedures more than he already is. The Applicants are particularly concerned about the fact that they are not given advance notice of sales of assets. Although this request was first made by the Receiver, the Court, not the Receiver, made the ultimate decision as to what procedures would be used to approve of sales, after giving all parties the opportunity to provide input. The Court decided that Court approval would be needed for sales of all properties valued at more than $250,000, rather than $1

---

[2] While, in conjunction with the hearing on the preliminary injunction, Defendants argued that the assets were worth more than the SEC asserted, even their estimates suggested that at most investors could recover 80 cents on the dollar.

million as proposed by the Receiver. The Court determined that the Receiver should submit individual sales to the Court under seal for approval. Desiring to maximize the amount of money returned to investors and to prevent purposeful underbidding and firesale prices, the Court decided that the details of individual transactions should be filed with the Court under seal. When these requests come in, the Court reviews them, including the documentation of valuations and the multiple appraisals from different sources submitted by the Receiver for each property, quite carefully. Opening up this process would lead to lower sales prices and delays in the approval of transactions, neither of which would benefit the Applicants or the other investors.[3]

Regarding the pay out of claims to investors, the Receiver will initially contact the investors with a suggestion as to the amount of their claim, based on the Receiver's reconstruction of the TLC entities' records. If an investor disagrees with that amount, he or she can inform the Receiver and ask for re-evaluation. If the Receiver and an investor are not able to agree on the amount of that investor's claim, the investor may seek review from this Court. Thus, the current procedures already adequately protect the investors in determining the amount of their claims.[4]

Similarly, the Court sees no benefit to be gained at this time from appointing a creditors' committee. The Receiver, an arm of the Court, represents the interests of all the investors. The Receiver and his counsel, charged with representing the interests of all investors, are properly being paid out of Receivership funds. It would be duplicitous and a waste to pay other lawyers out of the same funds, even if payment was only for the "value added" by those lawyers. The SEC has also raised the point that if there are any funds remaining after distributions to investors and creditors, such funds possibly

---

[3] The Court is particularly concerned about delays in approving sales given that while the economy is not yet in a recession, many relevant markers indicate that a recession is a real possibility.
   The Court is considering ordering that the details of individual transactions be unsealed after the transactions are finalized and closed. The Court envisions the Receiver notifying the Court when a transaction is finalized and directing the Clerk to unseal the documents filed regarding that transaction. The Court requests that the Receiver file a declaration with the Court setting forth his position regarding this idea.

[4] The Applicants note that the Receiver's report to the Court appeared not to provide for Court review of disputed claims. The Court would have required such review even if the Applicants, through counsel, had not appeared at the hearing and requested such review.

1 | could constitute disgorgement which, by statute, apparently cannot be distributed as private attorneys'
2 | fees without the SEC's consent. Securities and Exchange Act of 1933 § 20(f), 15 U.S.C. § 77t(f);
3 | Securities Act of 1934 § 21(d)(4), 15 U.S.C. § 78u(d)(4).

4     Finally, credible evidence, consisting of the letters and emails submitted as exhibits by the SEC
5 | and the Receiver, demonstrate that there is a connection between former agents of TLC investment
6 | vehicles and the current group of Applicants. Former agents have spearheaded the efforts to organize
7 | this group and have paid, at least initially, for the group's legal representation. The Applicants' group
8 | was formed as a result of letters sent to investors by former agents, including Mike McAfee and Gary F.
9 | Vick. *See* Supplement to Receiver's Response, Ex. B. These letters explain that the agents are trying to
10 | protect their clients by forming this group and seeking a larger voice in the proceedings. They also
11 | explain that the agents have, until now, paid all legal fees incurred by the Applicants' current counsel
12 | and their former counsel, Richard O. Weed. Apparently in response to the Court's comments at a
13 | hearing on March 6, 2001, during which the Court commented that intervention or participation,
14 | including the payment of legal fees, by former agents presented a conflict, the agents now ask the
15 | investors to pay $75 each to their current counsel in order to secure representation. The letter sent by
16 | Gary Vick to investors on March 15, 2001 states:

> Up until now, all of the legal fees paid to the Weed Law Firm and Gibson,
> Dunn & Crutcher [the Applicants' current counsel], totaling almost
> $50,000 have come from a group of former TLC Agents, including
> myself. Unfortunately, the SEC and Receiver have made claims that the
> Agent's [sic] contributions to this cause are "tainted", and have questioned
> the validity of the representation before the Court. Based on advice from
> the attorneys, we believe it prudent to request that the investors being
> represented, contribute a nominal amount for the GDC representation. We
> have been told that if all or the majority of the creditors/investors
> contribute $75 each for this representation, this should carry legal fees for
> the Steering Committee for the remainder of the year. It is very important
> that these funds be mailed to Gibson, Dunn & Crutcher, LLP as soon as

> possible, otherwise there may not be representation at the April 2, 2001 Court hearing. This is critical, as at this hearing, we expect Judge Carter to rule on the Motion to Intervene and the authorization for the Investors Steering Committee. **Please send this amount directly to GDC, no later than March 26, 2001, at the following address:** . .
>
> . .
>
> It is extremely important that all investors who can, contribute this nominal sum, so as to minimize the overall expense to each investor. **I strongly encourage you to execute the retainer letter sent by GDC and remit the $75 fee. GDC is an excellent firm that is capable of assisting all TLC investors in maximizing the return of their investment.**

*Id* (emphasis in original).

The Court is concerned that this and similar letters could have a coercive effect on victimized investors, some of whom have lost a substantial portion of their assets, and make them feel that their interests will not be adequately represented unless they agree and pay the money. The former agents, who in many cases perhaps personally profited from or participated in Defendants' wrongdoing through commissions, have quite divergent interests from the innocent investors and from the SEC and the Receiver. In fact, the Court has authorized the Receiver to seek the return of wrongfully paid commissions from these individuals. While the vast majority of the Applicants are innocent investors, any potential that the management of the proposed creditors' committee could include former agents is a significant concern to the Court.[5] *See SEC v. Wencke*, 622 F.3d 1363, 1372-73 (9th Cir 1980) (stating that it may be appropriate not to lift the stay when there is a "genuine danger" that the request is connected to the "original fraudulent scheme").

In considering a motion to lift the stay, the Court should consider:

---

[5] The Court makes no finding of fault regarding current counsel for the Applicants, who has attempted to determine which of the Applicants are former agents and has filed amendments to the Applicants' pleadings providing this information and has stated that his intention is to represent non-agent investors. However, the evidence submitted by the Receiver and the SEC demonstrates that there are strong connections between the former agents and the Applicants.

(1) whether refusing to lift the stay genuinely preserves the status quo or whether the moving party will suffer substantial injury if not permitted to proceed; (2) the time in the course of the receivership at which the motion for relief from the stay is made; and (3) the merit of the moving party's underlying claim

*SEC v. Universal Fin.*, 760 F.2d 1034, 1037-38 (9th Cir. 1985)  Here, the Applicants have failed to satisfy the first factor  They have not shown how they will suffer substantial injury if the current procedures are maintained. Therefore, balancing the Applicants' position against the need to protect and marshal the assets of the Receivership estate, protect defrauded and innocent investors, and judicial economy, the Court DENIES the Applicants' request to require the Receiver to follow all aspects of the bankruptcy code.[6]

**B.   Motion to Intervene**

In the alternative, the Applicants request that they be allowed to intervene as plaintiffs in this action.

**1.   Intervention in SEC Actions**

The SEC argues that intervention is never allowed in an SEC action without the SEC's consent. It bases this argument on Section 21(g) of the Securities Act of 1934, which provides that "no action for equitable relief instituted by the Commission pursuant to the securities laws shall be consolidated or coordinated with other actions not brought by the Commission, even though such other actions may involve common questions of fact, unless such consolidation is consented to by the Commission." 15

---

[6] The Court notes that it takes its supervisory role over the Receiver quite seriously  Further, while the current procedures may be less formal than those followed under the bankruptcy code, their flexibility allows for adequate involvement by the investors. The Court requires the Receiver to keep the investors informed of his actions. The Receiver, quite commendably, has expended significant amounts of time responding to and corresponding with investors about the administration of the Receivership. The Court intends to continue to make the appropriate decision for each situation that arises, such as, for example, instructing the Receiver and counsel for the Applicants to work together informally to administer the plan approved by the Court for advancing sums to those investors in hardship situations. Similarly, the Court intends to continue to allow investors to appear through counsel at hearings prior to approving the Receiver's reports  In addition, the Court is open to considering ways of allowing the investors to bid on any of the TLC properties, if they desire to do so.

U.S C. § 78u(g).

Some district courts have interpreted this provision as barring intervention in actions initiated by the SEC. *SEC v Homa*, No. 99 C 6895, Fed Sec. L. Rep. (CCH) ¶ 91,223, 2000 WL 1468726, at *2 (N.D Ill. Sept. 29, 2000); *SEC v. Wozniak*, No. 92 C 4691, 1993 WL 34702, at *1 (N.D. Ill. Feb. 8, 1993); *SEC v. Egan*, 821 F. Supp 1274, 1275 (N.D. Ill. 1993) These courts draw support from a Supreme Court opinion, which stated in dicta that "the respondent probably could not have joined in the injunctive action brought by the SEC even had he so desired" and cited § 21(g). *Parklane Hosiery Co, Inc. v Shore*, 439 U.S. 322, 332 & n.17, 99 S. Ct 645, 652 & n 17, 58 L. Ed. 2d 552 (1979).

Other courts, including the one circuit court that has directly addressed the issue, hold that the plain language of the statute bars only consolidation, not intervention. *SEC v. Flight Transportation*, 699 F.2d 943, 948 (8th Cir 1993); *SEC v Credit Bancorp, Ltd*, 194 F R.D. 457, 466 (S D.N Y 2000) The Ninth Circuit has never directly addressed the question, but in a 1978 case it noted, without mentioning § 21(g), that the district court below perhaps should have allowed intervention *Lincoln Thrift*, 577 F.2d at 609. Cases from other circuits similarly discuss the propriety of intervention on the given facts without mentioning § 21(g) either way. *SEC v. Dresser Indus, Inc*, 628 F.2d 1368, 1390 (D.C. Cir. 1980); *SEC v. Everest Mgmt. Corp*, 475 F.2d 1236, 1238-40 (2d Cir 1972). One district court within the Ninth Circuit has allowed intervention, without mentioning § 21(g) but citing *Flight Transportation*. *SEC v Navin*, 166 F.R.D 435, 440 (N.D. Cal. 1995) Another district court within the Ninth Circuit, in an unreported decision, stated that intervention "appeared" to be barred by § 21(g) but proceeded to analyze the propriety of intervention under the generally applicable rules anyway. *SEC v. Whitworth Energy Res., Ltd*, No CV 97-6980 CAS (SHx) (C D Cal. Sept 27, 1999) (minute order denying motion to intervene)

There are sound policy reasons why, if consolidation is prohibited, intervention also should be. In a concurring opinion, Justice Blackmun once considered the policy and purpose of § 21(g) in light of its legislative history. *Aaron v. SEC*, 446 U.S. 680, 717 n.9, 100 S. Ct. 1945, 1966 n.9, 64 L. Ed. 2d 611 (1980) (Blackmun, J., concurring). Private actions are very different from SEC actions. "'Private actions frequently will involve more parties and more issues than the Commission's enforcement action, thus greatly increasing the need for extensive pretrial discovery.'" *Id* (quoting S. Rep. No. 94-75, at 76

(1975), *reprinted in* 1975 U.S C.C.A.N 179, 254). Because of these differences, Justice Blackmun concluded that § 21(g) was passed "[i]n reliance on the different purposes of Commission enforcement proceedings and private actions " *Id.* These differences apply as equally when private parties seek to intervene in an SEC action as when consolidation of an existing private action with an SEC action is considered. For example, on this motion 700 investors seek to bring individual claims, including claims not brought by the SEC, such as state common law claims. Without a bar on intervention, § 21(g) could easily be eviscerated while a private action could not be consolidated with an SEC action, those proceeding in a private action could merely end that action and instead intervene in the SEC's action

However, the plain language of § 21(g) bars only consolidation. It makes no mention of intervention, and the Federal Rules of Civil Procedure contain no exception to intervention for SEC actions While some lower courts have extended § 21(g) to bar intervention as well as consolidation, no circuit court has done so, and in fact one circuit has held it does not extend to intervention.

In this case, the Court need not resolve the question, because even setting aside § 21(g), the Applicants have not met their burden in seeking to intervene.

### 2. Intervention as of Right

Federal Rule of Civil Procedure 24(a) provides:

> Upon timely application anyone shall be permitted to intervene in an action . . when the applicant claims an interest relating to the property or transaction which is the subject of the action and the applicant is so situated that the disposition of the action may as a practical matter impair or impede the applicant's ability to protect that interest, unless the applicant's interest is adequately represented by existing parties

Thus, there are four requirements for intervention as of right: (1) timeliness, (2) an interest relating to property or transaction that is the subject of the action, (3) disposition of the action may impair or impede the applicant's ability to protect the interest, and (4) the applicant's interest is not adequately represented by existing parties. *Northwest Forest Res. Council v. Glickman*, 82 F.3d 825, 836 (9th Cir. 1996). Failure to satisfy even one of these elements prevents the applicant from intervening as of right. *League of United Latin Am Citizens v. Wilson*, 131 F.3d 1297, 1302 (9th Cir. 1997).

Here, the second and third elements are met. As investors in Defendants' scheme, the Applicants have an interest relating to the transaction that is the subject of the action. The disposition of the action, because it is likely to use up all remaining assets of the TLC entities, may, as a practical matter, impair the Applicants' ability to protect their interests in the property in other forums. Arguably, the first element, timeliness, is not met. The Applicants have waited until several months after the liquidation plan and sale procedures were approved to make their motion. The discovery cut-off is set for June 1, 2001, less than two months away. The Court notes, however, that the Applicants tried to bring this matter to the Court's attention via *ex parte* application almost a month ago, but were directed by the Court to file the motion on regular notice. However, the Court need not decide whether the motion is timely, because the Applicants have not satisfied the fourth element, inadequacy of existing representation.

Other courts have noted that the SEC's interests in such an action include protection of the public at large and stopping and deterring future violations of the law, which differ slightly from the investors' desire to maximize their own recovery. *Flight Transportation*, 699 F.2d at 948. Therefore, the Court will consider whether the Receiver adequately represents the interests of the Applicants. To do so, the Court must consider: (1) whether the Receiver's interests are such that he will "undoubtedly" make all the Applicants' arguments, (2) whether the Receiver is capable of and willing to make such arguments, and (3) whether the Applicants "would offer any necessary elements to the proceedings that" the Receiver would otherwise "neglect." *Northwest Forest Res. Council*, 82 F.3d at 838.

Although an applicant seeking to intervene need show only that the representation of existing parties "may be" inadequate, *id.*, when existing parties and an applicant for intervention "have the same ultimate objective, a presumption of adequacy of representation arises," *id.* (quotation marks and citation omitted). Here, the Receiver's goal is to maximize distributions to defrauded investors. The Applicants have the same goal. *See* Applicants' Reply at 1:10-13 ("The TLC investors, the SEC, and the Receiver unquestionably share a common goal in this case: the maximization of the value of TLC's estate to allow the largest return possible to the TLC investors."). In their letters encouraging investors to become a part of the Applicants' group, former agents made comments such as, "The primary goal of the Steering Committee and the Gibson, Dunn & Crutcher representation is to maximize the recovery to

each individual investor" and "I would like to reiterate that we are all working towards the same goal as the SEC and Receiver, returning the greatest amount of money to the investors as possible." Supplement to Receiver's Response, Ex. B at 1, 4.

The Applicants have not noted any ways in which their ultimate goal differs from that of the Receiver. In any situation in which the pie is limited, each individual desiring a slice of that pie is, in a sense, adverse to others also wanting a slice of the pie. However, the Applicants have not shown any specific ways in which the Applicants are situated differently from other investors. For example, they have not noted any ways in which one investor, or a subgroup of investors, has a claim based on a legal argument that is inconsistent or at-odds with the legal arguments available to another group. *Cf. Navin*, 166 F.R.D. at 437, 441 (allowing intervention as of right when the intervenors had significant interests in the ongoing concern of a business in receivership but no stock or other formal interest).

Given that the Applicants and the Receiver have the same goal, the Applicants must rebut the presumption that his representation will be adequate. They have not done this. The Applicants make only one argument as to why the Receiver does not adequately represent their interests: they do not agree with the "secretive" sales procedures approved by the Court. They do not disagree with the goal of getting the highest possible sales price for each asset; they just do not trust that the Receiver and the Court are able to make that decision and they think that their input on each proposed asset sale would be beneficial. The Court has already considered and approved of the sales procedure and does not plan to change it. Therefore, the Applicants have not shown any ongoing differences of opinion between them and the Receiver.[7]

More importantly, however, this is not a different goal, it is only a different strategy. The Ninth Circuit has held that the inadequacy of representation element of the intervention test is not met when the applicants present only a difference in strategy. *Northwest Forest Res. Council*, 82 F.3d at 838. Further, several circuit courts have denied intervention as of right when the applicants may assert their claims in a summary claims process that, both through the procedures used by the receiver and review

---

[7] That the Applicants seek to assert additional causes of action, requiring different types of proof in some cases, does not change the fact their ultimate goal is the same as the Receiver's: to take all available TLC money and divide it up amongst the investors equitably.

by the district court, provides adequate due process to the investors. *CFTC v. Chilcott Portfolio Mgmt., Inc*, 725 F.2d 584, 586-87 (10th Cir. 1984); *CFTC v. Heritage Capital Advisory Servs., Ltd*, 736 F.2d 384, 386-87 (7th Cir 1984); *SEC v. Charles Plohn & Co*, 448 F.2d 546, 549 (2d Cir. 1971). Here, through the claims process investors may assert any arguments they may have regarding the amounts due to them.

The Applicants have asserted only one way in which they believe that the Receiver does not adequately represent their interests, and it is about an issue that has already been decided by the Court and further is just a difference in strategy, not a difference in ultimate goals.[8] Therefore, they have not met their burden of showing that existing parties will not adequately represent their interests Accordingly, the Court DENIES the Applicants' motion to intervene as of right.

---

[8] In their reply brief, the Applicants also state that they disagree with immediate liquidation. Again, the Court has already made this decision, for the reasons set forth above, and does not intend to revisit it. Thus, this difference of opinion also is both moot, as the issue has been decided by the Court, and also just a difference in strategy, not in goals. Fundamentally, there appears to be something of a mismatch between the desire of some of the Applicants to have the Receivership run as though it were an ongoing business and what is possible at this point The TLC entities are not an ongoing business. Unfortunately, the investors in this situation have been victimized by the actions of the Defendants. The Court can stop this from happening again, and it can return as much money as possible to the investors, but it cannot turn the TLC entities into an ongoing, profitable investment It would not be appropriate for the Court, or the Receiver on behalf of the Court, to become a real estate developer.

The papers filed by the Applicants on this motion do not reference a former plan, which arose while Weed was involved with the group, for one entity to exchange all the TLC properties for annuity contracts, based on the value of the insurance currently on the properties. However, in the letters sent by former agents to investors encouraging them to become a part of the group making this motion, this idea is mentioned again This plan has never actually been put before the Receiver or the Court for consideration. When approached about it, the Receiver said he was open to considering all ideas but said that he needed for the entity to present a proposal to him. The agents never did so, instead keeping the entity's identity a secret and saying the proposal could not be finalized until the Receiver first turned over to them information about the TLC properties. The Receiver would not give out this information until he was first presented with information about the entities interested in the idea. The Receiver's actions were entirely appropriate. He has a fiduciary responsibility to the Receivership and a general responsibility to all the investors that make it inappropriate for him to release extensive information about the TLC properties to the agents. If an entity actually exists that is interested in such a plan, it is its responsibility to present a preliminary proposal to the Receiver. The Court notes in passing, however, that the value of the insurance currently on the properties does not seem like a particularly useful valuation means for any rational business proposal.

### 3. Permissive Intervention

Federal Rule of Civil Procedure 24(b) provides:

> Upon timely application anyone may be permitted to intervene in an action . . . when an applicant's claim or defense and the main action have a question of law or fact in common. . . . In exercising its discretion the court shall consider whether the intervention will unduly delay or prejudice the adjudication of the rights of the original parties

In addition, the applicant for intervention must show an independent basis for federal jurisdiction *Northwest Forest Res Council*, 82 F.3d at 839.

Here, the Applicants have asserted federal securities claims so the Court has an independent basis for jurisdiction over their proposed claims. In addition, undeniably their claims have questions of fact and law in common with the main action

However, allowing intervention would unduly delay this action. The Applicants seek to add the claims of 700 individual plaintiffs. Their claims, while overlapping with those of the SEC in large part, include additional securities causes of action and state law claims. In the interest of resolving this matter relatively quickly in order to get money back to all the investors as soon as possible, the Court set a relatively quick schedule for this case. The case was filed early in October 2000 and it is set for trial in November of 2001. The discovery cut-off date is June 1, 2000, less than two months away If the Applicants are allowed to intervene, they will need to do additional discovery for their own causes of action. A trial involving 700 individual claims would be much more extensive than a trial involving the SEC's claims on behalf of the investors and the general public. *See generally Everest Mgmt.*, 475 F 2d at 1239-40 (upholding denial of leave to intervene permissively in an SEC action). Thus, allowing intervention would most likely significantly delay resolution of this matter, which would hurt all the investors, including the Applicants. Therefore, the Court DENIES the Applicants' motion for permissive intervention.

//
//
//

## III.

## CONCLUSION

For the foregoing reasons, the Applicants' motion to lift the stay or, alternatively, intervene is DENIED

IT IS SO ORDERED.

DATED: April 6, 2001

                             *David O. Carter*
                             DAVID O. CARTER
                             United States District Judge